

# OAKWOOD HOMES

EXHIBIT
C

## Sales Office Deposit Sheet

Batch Number: _____

Post Yr/Month: _____

Reference: _____  _____ accounting use only

Buyer Name: Derrick J Martin Jr. and Alexa S Martin    Prospect Number: _____

### Deposit Schedule

| Description | Amount | Date Due | Status | Date Received | Check# |
|---|---|---|---|---|---|
| Option Inducement Fee #1 | $ 9,500.00 | 7/7/2016 | Received | 7/7/2016 | 1102 |
| Earnest Money #1 | $ 500.00 | 7/7/2016 | Received | 7/7/2016 | 1102 |

/ 1 / 32
PROJECT ID / BLOCK / LOT

PROJECT ID NUMBER: _____    Closing Coordinator Verification: _____

COMMUNITY NAME: Ranch House at Tollgate Crossing (tga0800)    SALES PERSON NAME: Laura Duhot

---

DERRICK MARTIN
4221 CHIPPEWA DR.
LARAMIE, WY 82072

99-713/1070      1102

DATE 7/7/16

PAY TO THE ORDER OF  Oakwood Homes    $ 10,000.00

Ten Thousand 00/100    DOLLARS

Wyoming STATE BANK
3430 E. Grand Ave.
PO Box 700
Laramie, WY 82073
(307) 721-9100
www.wyomingstatebank.com

MEMO BLK 1 LOT 32 (EM)

⑈107007139⑈ 100114511⑈    1102

# Oakwood Homes, LLC
## Sales Agreement

### Ranch House at Tollgate Crossing (tga0800)

**Date:** 7/7/2016
**RE:** Contract dated 7/7/2016 between Derrick J Martin Jr. and Alexa S Martin (Buyer) and Oakwood Homes (Seller), relating to the sale and purchase of the following described real estate in Arapahoe County, CO:
known as Lot 32, Block 1, Subdivision, Ranch House at Tollgate Crossing (tga0800), Filing 10, Arapahoe County, CO, which is also known and numbered as 23593 E. Chenango Place, Aurora, CO 80016.

#### CURRENT INFORMATION REGARDING THE BUYER

**BUYER 1:**

Name: Derrick J Martin Jr.
Address: 4221 Chippewa Dr
Laramie, WY 82072
Home Phone Number: (720) 724-5346
Work Phone Number:
Cell Phone Number:
E-Mail Address: dmartinxx@yahoo.com

**BUYER 2:**

Name: Alexa S Martin
Address:

Home Phone Number:
Work Phone Number:
Cell Phone Number:
E-Mail Address: martin29@hotmail.com

#### INFORMATION REGARDING THE BROKER

Name of Agency: N/A
Name of Agent or Broker: Derrick Martin
Address:

Agency: N/A
Agent Phone Number:
Cell Phone Number:
Fax Number:
E-Mail Address:

**Additional Contact Information or Preferences:**

**Buyer and Seller hereby agree to the contract as follows:**

| Item No. | Event | Date or Deadline |
|---|---|---|
| 1 | Loan Application Deadline | 7/12/2016 |
| 2 | New Home Center | 7/22/2016 |
| 3 | Preliminary Loan Approval Deadline | 7/22/2016 |
| 4 | Right of Revocation Deadline | 7/12/2016 |
| 5 | Loan Approval Deadline | 8/21/2016 |
| 6 | Contingency Approval Deadline (frame start) | |
| 7 | Listing Agreement Deadline | 7/12/2016 |

Costs:
Plan Price     $ 423,500.00
Lot Premium    $ 5,000.00

# Oakwood Homes, LLC
# Sales Agreement

## Ranch House at Tollgate Crossing (tga0800)

Date of this Agreement: 7/7/2016

Model Name: Vail (tga0800-805) Plan Number: Elevation: Elevation / Elevation A

THIS SALES AGREEMENT (the "Agreement") is between OAKWOOD HOMES LLC, a Colorado limited liability company (the "Seller"), and Derrick J Martin Jr. and Alexa S Martin (collectively, the "Buyer"), as __ joint tenants or X tenants in common. The Buyer and the Seller are sometimes individually referred to herein as a "Party" and collectively as the "Parties." The date written on the top line of this Agreement is referred to herein as the "Date of this Agreement."

RECITALS:

A. The Seller is or will be the owner of the following described property (the "Property"): Lot 32, Block 1, Subdivision, Ranch House at Tollgate Crossing (tga0800), Filing 10, Arapahoe County, CO, which is also known and numbered as 23593 E. Chenango Place, Aurora, CO 80016. The Seller has constructed or will construct a residence (the "Residence") on the Property that is more particularly described in Section 1.1 hereof. The Property and the Residence are sometimes collectively referred to in this Agreement as the "Property."

B. The purpose of this Agreement is to set forth the terms and conditions upon which the Buyer will purchase, and the Seller will sell, the Property. It is the intention of the Buyer and the Seller that this Agreement set forth their entire understanding and Agreement and that all prior agreements and discussions between them are replaced by this Agreement.

COVENANTS:

For mutual consideration and upon the terms of this Agreement, the Buyer agrees to buy and the Seller agrees to sell the Property. The terms of the purchase and sale of the Property are as follows:

**SECTION 1. PURCHASE PRICE.** The Parties agree as follows with respect to the purchase price (the "Purchase Price") that the Buyer will pay the Seller to purchase the Property:

**1.1 The Purchase Price.** The Purchase Price is $ 463,935.00. The plan price, lot premium, options, credits, and other adjustments regarding the Purchase Price are set forth in a written instrument executed by the Parties and made a part of this Agreement by this reference. The amount of the Purchase Price may be adjusted pursuant to Change Orders as described in Section 4.4 hereof and, as adjusted by such Change Orders, is referred to herein as the "Purchase Price."

**1.2 Earnest Money Deposit.** The earnest money deposit for the Property is $ 500.00 and is referred to herein as the "Earnest Money Deposit." The Buyer is paying the Earnest Money Deposit to the Seller as a deposit to secure the Buyer's performance pursuant to this Agreement. The Seller will credit the earnest money deposit towards the amount due from the Buyer at Closing (as that term is defined in Section 1.4 below).

**1.3 Option Inducement Fee.** The option inducement fee for the Property is $ 9,500.00 and is referred to in this Agreement as an "Option Inducement Fee." The Buyer is paying the Option Inducement Fee to the Seller in exchange for the Seller granting the Buyer the right to purchase the Property during the term of this Agreement. **Except as specifically provided for in this Agreement, the Seller will not refund the Option Inducement Fee to the Buyer.** The Seller will credit the option inducement fee towards the amount due from the Buyer at closing.

**1.4 Balance Due at Closing.** The balance of the Purchase Price is due from the Buyer at the closing (the "Closing") of the sale of the Property and shall be paid by a certified check or the wire transfer of readily available Federal funds.

**SECTION 2. FINANCING.** The Parties agree as follows with respect to the Buyer's financing of its purchase of the Property:

**2.1 Application for Loan.** If Buyer will use the proceeds of a loan (the "Loan") to finance its purchase of the Property, the Buyer must apply for the Loan from a lender (the "Lender") of Buyer's choice within 5 days of the Date of this Agreement. The Buyer must submit an application (the "Loan Application") and such other documents and information accompanying the Loan Application as the Lender may require.

  a. Furnish Information Following Application. The Buyer agrees to (i) promptly furnish all information required by the Lender with the Application and afterwards, (ii) diligently pursue the Loan following submittal of the Application, and (iii) accept the Loan.

  b. Right of Seller to Terminate if Buyer Does Not Apply for the Loan. **THE BUYER ACKNOWLEDGES THAT FAILURE TO APPLY FOR THE LOAN WITHIN 5 DAYS OF THE DATE OF THIS AGREEMENT MAY RESULT IN**

**2.2 Preliminary Approval of Loan.** Buyer must supply the Seller with confirmation that a lender has given the Buyer preliminary approval of the Loan (the "Preliminary Loan Approval") to finance the Buyer's purchase of the Property no more than 15 days following the Date of this Agreement. With respect to this Preliminary Loan Approval, the Parties acknowledge that (a) Preliminary Approval is not the same as a final approval of the Loan, (b) the Buyer must apply for final approval of the Loan (as described in Section 2.3 below), and (c) the Buyer must timely provide the Lender with the information that the Lender will require to process the application for the Loan.

   a. <u>Terms of the Loan.</u> It is the Buyer's obligation to obtain and accept a Loan. The Lender will determine the amount of the Loan, the rate of interest, and its maturity. These Loan terms will depend upon the type of financing the Buyer is applying for and the Lender's underwriting. The Parties acknowledge that (i) any terms regarding the Loan (such as amount, interest rate, monthly payments, etc.) that are quoted to the Buyer at the Date of this Agreement are estimates only, (ii) the actual terms of the Loan may differ from these estimates, (iii) the actual terms of the Loan will be determined by the Lender at the time of the Closing, and (iv) the Seller is not responsible for the terms of the Loan or changes in the terms of the Loan from the terms originally quoted to the Buyer.

   b. <u>Lender Orientation Packet.</u> The Buyer shall (i) promptly give the Seller notice of the Lender that Buyer has selected within three (3) working days of its decision, (ii) provide the Seller with a signed (by the Lender) Outside Lender Orientation Packet within 15 days, and (iii) provide written evidence of the approval of the Loan from the Lender (and not the mortgage broker, if applicable) promptly upon receipt of such approval. If the Buyer does not comply with this provision, the Seller, at its option, may terminate this Agreement by notice to the Buyer or impose an administration fee.

   c. <u>Cash Transaction.</u> If the Buyer elects to pay the Seller in cash for the Property, the Buyer must show verification of liquid funds.

   d. <u>Authorization to Obtain Credit Information and Assist in Loan Application Process.</u> The Buyer agrees that Buyer's Lender may contact the Seller and provide information to the Seller regarding all aspects of the Loan. The Buyer consents to the Seller working with the Lender in processing and reviewing the Loan Application. The Buyer acknowledges that the Seller is under no obligation to participate in the Lender's processing and review of the Loan. By participating in the Lender's processing and review of the Loan, the Seller does not assume any responsibility for the approval or rejection of the Loan Application or for any of the terms of the Loan. The Seller and its agents or appointees may now and in the future (i) have access to obtain all credit or account information from any source regarding the Buyer and (ii) reveal such information to such persons as Seller determines in connection with the Buyer's purchase of the Property.

   e. <u>Changing Lenders.</u> The Buyer may not switch lenders following Pre-Drywall start without the Seller's prior written consent. The Seller may condition its consent on the Buyer paying a reasonable fee to cover any additional costs to the Seller resulting from the Buyer's change in lenders. In addition, the Seller may condition its consent on its being satisfied that the change in lenders will not delay the closing. **If the Buyer does not comply with this provision, the Seller, at its option, may terminate this Agreement by notice to the Buyer. If the Seller elects to terminate this Agreement pursuant to this Section 2.2.e, it will notify the Buyer of such fact, the Seller will keep the Earnest Money Deposit and the Option Inducement Fee, and the Buyer will have no further right to the Property.**

**2.3 Approval of Loan.** The Buyer's Loan must have all conditions approved by 8/21/2016 (the "Approval Date"), which date is established by the Seller's policy as being no more than forty-five (45) days following the Date of this Agreement. For the purposes of this Agreement, the Loan will be considered a "Fully Approved Loan" when the Loan has been approved subject only to (a) a final appraisal of the Residence, (b) a final inspection of the Residence, and (c) satisfaction of the Existing Property Sale Contingency (as that term is defined in and as provided in Section 3.2 below). **IF THE BUYER DOES NOT HAVE FULL LOAN APPROVAL AND ALL CONDITIONS APPROVED BY THE APPROVAL DATE, THEN THE SELLER MAY TERMINATE THIS AGREEMENT. If the Seller elects to terminate this Agreement pursuant to this Section 2.3, it will notify the Buyer of such fact. Upon the giving of such a notice, the Seller will keep the Earnest Money Deposit, the Option Inducement Fee, and all other monies paid by the Buyer to the Seller and the Buyer will have no further right to the Property.** The foregoing provision is subject to any applicable requirements or rules of the Department of Housing and Urban Development ("HUD"), the Federal Housing Administration ("FHA") or the Veteran's Administration ("VA").

**2.4 Authorization to Start.** The Property will not start the process of construction until the Property has been authorized to Start. Authorization is based on Preliminary Loan Approval and approval of any applicable contingencies.

**SECTION 3. BUYER'S EXISTING PROPERTY SALE CONTINGENCY. All contingencies must be approved by the Seller's Contingency Acceptance Program no more than fifteen (15) days following the Date of this Agreement or the Seller, at its discretion, may terminate this Agreement.** The Parties agree as follows regarding the sale by the Buyer of Property owned by the Buyer that the Buyer must sell either to have sufficient funds to purchase the Property or to qualify for the Loan:

**3.1 No Buyer's Existing Property.** The Buyer will not need the proceeds from the sale of any Property owned by the Buyer to purchase the Property or to obtain a Fully Approved Loan.

Buyer's Initials (as to applicability of Section 3.1): _XM_ / _DM_

**3.2 Buyer's Existing Property.** The Buyer will need the proceeds from the sale of the Buyer's Existing Property to purchase the Property or to obtain a Fully Approved Loan. The Parties agree that this Agreement and their obligations hereunder are contingent upon the Buyer selling the Buyer's Existing Property. This contingency is referred to in this Agreement as the

**3.3 Sale of Buyer's Existing Property.** The Buyer agrees to sell the Buyer's Existing Property in accordance with the following:

   a. Listing. The Buyer agrees that the Buyer's Existing Property is listed in a multi-listing service (MLS) within 5 days of the Date of this Agreement. At the Seller's request, the Buyer will provide the Seller with a copy of the listing agreement. **If at any time the Buyer's Existing Property is not listed in a multi-listing service, then the Seller, at its election, may terminate this Agreement. If the Seller elects to terminate this Agreement pursuant to this provision pursuant to this Section 3.3.a, it will notify the Buyer of such fact. Upon the giving of such a notice, the Seller will keep the Earnest Money Deposit, the Option Inducement Fee, and all other monies paid by the Buyer to the Seller and the Buyer will have no further right to the Property.**

   b. Notification: Closing. The Buyer agrees to keep Seller informed on the progress of closing the Contract for Sale of the Buyer's Existing Property. The Buyer will advise the Seller within seven (7) days following the closing of the Buyer's Existing Property. The Buyer will provide the Seller with proof of the closing of the transaction in the form of a completed and executed HUD-1 Settlement Statement.

**3.4 Satisfaction of Buyer's Existing Property Sale Contingency.** To satisfy the Buyer's Existing Property Sale Contingency, the Buyer must present to the Seller a complete, bona fide contract ("Contract for Sale of the Buyer's Existing Property") for the sale of the Buyer's Existing Property by Frame Start of the Property. Upon the Seller's acceptance of receiving the Contract for Sale of the Buyer's Existing Property, Buyer's Existing Property Sale Contingency will be deemed satisfied, the Earnest Money Deposit, the Option Inducement Fee, and all other monies paid by the Buyer to the Seller will all become non-refundable to the Buyer, and the Parties will proceed pursuant to this Agreement. The Buyer acknowledges that the Buyer is responsible for closing the Contract for the Sale of the Buyer's Existing Property on a timely basis so that the Buyer can perform its obligations hereunder.

**3.5 Failure to Satisfy Buyer's Existing Property Sale Contingency.** IF THE BUYER HAS NOT PROVIDED A CONTRACT FOR SALE OF THE BUYER'S EXISTING PROPERTY BY THE EXISTING PROPERTY SALE DATE, THEN THE SELLER MAY CANCEL THIS AGREEMENT. If the Seller elects to terminate this Agreement pursuant to this Section 3.5, it will notify the Buyer of such fact. Upon the giving of such a notice, the Seller will return to the Buyer the Earnest Money Deposit, the Option Inducement Fee, and all other monies paid by the Buyer to the Seller (less an administration fee of $100), and the Buyer will have no further right to the Property.

**SECTION 4. CONSTRUCTION OF RESIDENCE.** The Parties agree as follows with respect to the Seller's construction of the Residence:

**4.1 Completed Residence.** The Buyer is purchasing the Residence as a completed structure. The Seller is not acting as a contractor for Buyer in the construction of the Residence. The Buyer has no right to the Property or the Residence except for the right to buy the Residence and the Property as set forth in this Agreement upon completion of the Residence. The Buyer has no right to enter, modify, occupy, or possess the Property until possession is delivered at the Closing.

**4.2 Completion of Residence.** The Residence is to be constructed and completed substantially in conformance with the plans and specifications on file with and approved by the applicable city or county building department and the VA or FHA, if applicable. The Parties agree that the Residence shall, for all purposes, be considered completed in accordance with such plans and specifications upon receipt of (a) final inspection and approval by the Seller and issuance of a temporary or permanent certificate of occupancy by the applicable city or county or (b) if applicable, the issuance of the final compliance inspection report by VA or FHA.

**4.3 Construction Schedule and Completion Notice.** If the Residence has not been constructed as of the Date of this Agreement, then the Parties contemplate that it will be completed in accordance with the following:

   a. Construction Schedule. The Seller has a proposed sequence of events of the construction schedule (the "Construction Schedule") that sets forth the number of working days that the Seller anticipates that it will take to complete the Residence. The Seller will take reasonable steps to have the Residence completed within the time set forth in the Construction Schedule. The Construction Schedule for the Residence provides dates for the selection of the solar options described in Section 5.7 below. The Construction Schedule and the Seller's construction obligations are subject to the conditions that (i) the Buyer qualifies for the Loan and (ii) the Buyer performs its obligations. These conditions are for the benefit of the Seller, not the Buyer.

   b. Delays. Buyer and Seller acknowledge that Seller's obligations and the Construction Schedule are subject to delays resulting from Acts of God. Acts of God are conditions, events, and occurrences that are beyond the control of the Parties or that neither Party contemplated as of the Date of this Agreement. Examples of Acts of God include, but are not limited to, acts of terrorism, civil insurrection, delays in issuance of certificates or permits by governmental agencies, delays in obtaining approvals or inspections from governmental agencies, strikes and lock-outs, unavailability of craftsmen and labor or materials or both, war, weather, work stoppages, and similar matters.

   c. Notice of Completion. **No later than the rough inspection, the Seller will give the Buyer a notice of completion (the "Notice of Completion") and will schedule the Closing Date.**

**4.4 New Home Center Selections.** The Buyer agrees to meet with a representative of the Seller's New Home Center by no later than 15 days from the authorization to start. This meeting is referred to in this Agreement as the "Selection Meeting," and the

b. Change Orders Regarding Selections. The Selections will be evidenced by a written change order ("Change Order") that is signed by the Buyer and is accepted in writing by the Seller. The Change Order will amend this Agreement by (i) identifying the Selection, (ii) stating the cost of the Selection, and (iii) if applicable, stating the deposit received at the Selection Meeting. **A Selection will not be considered made until (1) the Seller has accepted it as evidenced by its execution of a Change Order amending the Purchase Price to include the total cost of all Selections and (2) the Buyer has made the deposit required by the Seller.**

c. Failure to Make Selections. **The Seller shall be authorized by the Buyer to make all decisions (including standard material and color Selections) as such Selections become necessary to prevent construction delays if (i) the Buyer has not made its Selections as evidenced by a Change Order that has been executed by the Seller by the Selection Date or (ii) the Buyer has failed to make a deposit in the amount and at the time required by a Change Order.**

d. Upgrades and Appraisal of Property. The Buyer acknowledges that Selections that represent upgrades above the Seller's standard for such items are solely at the option of the Buyer. The Seller will permit the Buyer to include these upgrades as increases in the Purchase Price of the Property and as an increase in the amount of the Loan rather than require a direct payment to the Seller. The Buyer acknowledges, however, that some or all of the Selections may not be considered part of the value of the Residence at the time the Residence is appraised for the Loan. If the upgrades are not included in the appraised value of the Residence, then the Buyer may be required to pay the costs of such upgrades at the Closing from its own funds, and the Buyer agrees to do so.

SELLER'S Initials: _____ BUYER'S Initials: _____

**4.5 Manner of Completion of Residence.** With respect to the construction of the Residence, the Buyer and the Seller agree as follows:

a. Changes by Buyer. **The Buyer does not have the right to make changes to the Residence after the Date of this Agreement except as the result of (i) a Selection provided for in Section 4.4 hereof and/or (ii) a change accepted by the Seller as evidenced by a Change Order the Seller has executed. Any changes including custom changes could result in a delay of completion of residence.**

b. Changes by Seller. The Seller has the right to make substitutions of materials in the event of a shortage of any item or material featured. The Seller has the right to adjust interior dimensions to accommodate electrical, mechanical, or other installations. The Seller has the right to make changes in the construction or design of the Residence when appropriate if, in Seller's opinion, such changes will (i) improve the Residence, its appearance, or its usability and (ii) result in substantially equal quality and utility and which conform to the requirements of the appropriate governmental authorities having jurisdiction over the Residence. Such changes shall be without additional cost to the Buyer. Consultation with Buyer regarding the Residence and its specifications is not (A) a waiver of the Seller's rights pursuant to this Section 4.5.b or (B) an agreement to construct the Residence to any standards unless specifically agreed upon in writing by the Parties.

c. Changes by Seller to Conform to Grade of Property. The Seller has the right to erect the Residence so that it conforms to the recommendations of the Seller's engineers regarding the grade of the Property.

d. Direction and Supervision. The Buyer acknowledges and agrees that the direction and supervision of the workers of the Property, including subcontractors, rests exclusively with the Seller. **The Buyer agrees not to give any instruction to or otherwise interfere with such workers.** The Buyer further agrees not to contract with Seller's subcontractors or to engage other builders or subcontractors except with the Seller's prior written consent (which consent may be withheld by the Seller in its discretion) and then only in such a way that it will not delay or interfere in any way with the Seller's completion of the Residence pursuant to this Agreement.

e. Fencing. The Property may have a fence constructed upon it that is intended to designate the approximate boundary line of the Property. The Seller does not warrant that the fence will be constructed exactly on the boundary line of the Property. The Seller shall not be responsible for minor deviations of the fence from the boundary line of the Property. The Buyer and the Seller agree that any fencing installed by the Seller may vary in height according to changes in the grade level of each individual lot.

f. Variations between Model Home and Residence. The Buyer has reviewed the finish materials in the sales office, the model homes, and/or the New Home Center of the Seller that are intended to be a relatively accurate presentation of typical workmanship and materials other than model home decorative finishes. The Buyer is aware that the model homes may include special effects such as decorator paint color, wall paper, window treatments, upgrade flooring, flooring layout (carpet versus hard surface and design), decorator built-ins, model furniture, mirrors, accessories, and similar items that are not included with the Residence. Renderings of model landscaping are suggestions of how the Residence may be landscaped. Model homes are displayed for illustrative purposes only. Such presentation shall not constitute an agreement, commitment, representation, or warranty on the part of the Seller to deliver the Residence in accordance with such presentation.

**4.6 Construction and Development of Subdivision in General.** With respect to the development of the area around the Property in general, the Parties acknowledge and agree as follows:

a. Escrow for Completion of Improvements. If the curb, walk, gutter, streets, final grading, exterior paint, or landscaping (purchased by the Buyer from the Seller) of the Property or the surrounding areas being developed by the Seller are not completed as of the Closing Date in accordance with VA and FHA specifications, then the Seller

c. <u>Surrounding Area Development.</u> With respect to the development of the area surrounding the subdivision in which the Property is located, the parties acknowledge and agree as follows:

   i. <u>Future Development.</u> The Buyer understands that the Seller presently plans to develop only those residences that have already been released for sale and construction and has no obligation with respect to future development, plans, and zoning of the real Property in the area of the Property. The Buyer acknowledges that amenities for the area and proposed residential, commercial, and other developments (collectively, "Future Development") in the area surrounding the Property that may have been illustrated in the sales office of the Seller or in materials prepared by the Seller were based upon the Seller's belief as of the Date of this Agreement about how such Future Development will occur.

   ii. <u>No Representation or Warranty about Future Development.</u> With respect to this Future Development, the Buyer acknowledges that (A) the Seller intends as of the Date of this Agreement that development will occur as shown on such plans and sales literature, (B) the Seller does not represent or warrant that Future Development will occur exactly as shown on such plans and sales literature, and (C) the Future Development may occur earlier or later than anticipated by the Parties as of the Date of this Agreement. Further, the Parties agree that the Seller is under no obligation to construct or install any amenity or development included as a part of such Future Development.

   iii. <u>Open Areas.</u> The Buyer acknowledges that Future Development may affect nearby open areas ("Open Areas"). These Open Areas are currently unimproved and are being used for agricultural purposes. Many of these Open Areas are zoned for development, and the Buyer's enjoyment of the Residence may be affected by Future Development of the Open Areas. Accordingly, the Buyer has or will review Future Development proposed for the Open Area to be sure that the Future Development will not adversely affect the Buyer's enjoyment of the Residence.

   iv. <u>No Reliance by Buyer on Future Development.</u> The Buyer acknowledges that the Buyer is not relying upon any information or representation from the Seller or its agents regarding (A) such Future Development, (B) the timing of such Future Development, or (C) the fact that any amenity or development included in the Future Development will be constructed by the Seller. The Buyer understands that no sales person in any way associated with the Seller has any authority to make any statement contrary to the provisions of this paragraph. Any concern the Buyer may have regarding the Future Developments or the use of surrounding land was satisfied by the Buyer's own independent research through the governmental agencies having jurisdiction over said land use.

d. <u>Unavailability of Utilities.</u> If, due to priorities, allocation of materials, or other events, the Seller is unable to obtain water or sewer connections or other utilities, including, but not limited to, natural gas, electricity, and telephone, the Seller shall have the right at any time hereafter to terminate this Agreement by giving written notice thereof to the Buyer. If the Seller elects to terminate this Agreement pursuant to this Section 4.6.d, it will notify the Buyer of such fact. Upon the giving of such a notice, the Seller will return to the Buyer the Earnest Money Deposit, the Option Inducement Fee, and all other monies paid by the Buyer to the Seller and the Buyer will have no further right to the Property.

**SECTION 5. DOCUMENTS AND DISCLOSURES RELATING TO THE PROPERTY.** The Buyer acknowledges receipt of the disclosures and the documents regarding the Property as described and listed on Addendum A. In addition to the disclosures set forth in Addendum A, the Buyer also acknowledges the following specific disclosures:

**5.1 Insulation Disclosure.** In accordance with the requirements of 18 C.F.R. § 460.16 promulgated by the Federal Trade Commission, the Seller has delivered to the Buyer the Seller's Insulation Disclosure (see Addendum A). The Seller's Insulation Disclosure sets forth the R-value, thickness, and type of insulation that will be installed in each part of the Residence. The Buyer acknowledges receipt of the Seller's Insulation Disclosure.

**5.2 Soil Disclosure.** In accordance with the requirements of C.R.S. § 6-6.5-101, the Seller has delivered to the Buyer (a) a summary report of the soils analysis and site recommendations for the Property and (b) a copy of Special Publication 43: A Guide to Swelling Soils for Colorado Homebuyers and Homeowners by David C. Noe, Candace L. Jochim, and William P. Rogers (Denver: Colorado Geological Survey, 1997) (hereinafter the "Guide to Swelling Soils"). The Guide to Swelling Soils details the problems associated with expansive soils, the building methods to address these problems during construction, and suggestions for care and maintenance to address such problems. The Guide to Swelling Soils is being delivered in compliance with the requirements of C.R.S. § 6-6.5-101. The Seller maintains a copy of the soils report on the Property in its sales office and corporate office.

This copy is available for review by the Buyer and the Buyer's consultants, engineers, or soils engineer or for copying. The Buyer acknowledges receipt of these disclosures and the additional agreements and disclosures regarding soils set forth in Section 10.4 of this Agreement

**5.3 Special District Disclosure.** In accordance with the requirements of C.R.S. § 38-35.7-101, the Seller makes the following disclosure to the Buyer:

**SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE PROPERTY WITHIN SUCH DISTRICTS. PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK FOR INCREASED MILL LEVIES AND EXCESSIVE TAX BURDENS TO SUPPORT THE SERVICING OF SUCH DEBT WHERE CIRCUMSTANCES ARISE RESULTING IN THE**

**5.4 Common Interest Community Disclosure.** In accordance with the requirements of C.R.S. § 38-35.7-102, the Seller makes the following disclosure to the Buyer:

THE BUYER HEREBY ACKNOWLEDGES THAT THE BUYER HAS RECEIVED COPIES OF THE MASTER DECLARATION AND THE DECLARATION OF COVENANTS, BYLAWS, AND RULES AND REGULATIONS OF THE HOMEOWNERS' ASSOCIATION OR METROPOLITAN DISTRICT IN WHICH THE PROPERTY IS LOCATED. THESE DOCUMENTS ARE MORE SPECIFICALLY DESCRIBED IN ADDENDUM A ATTACHED TO THIS AGREEMENT.

THE PROPERTY IS LOCATED WITHIN A COMMON INTEREST COMMUNITY AND IS SUBJECT TO THE DECLARATION FOR SUCH COMMUNITY. THE OWNER OF THE PROPERTY WILL BE REQUIRED TO BE A MEMBER OF ANY OWNER'S ASSOCIATION FOR THE COMMUNITY AND WILL BE SUBJECT TO THE BYLAWS AND RULES AND REGULATIONS OF THE ASSOCIATION. THE DECLARATION, BYLAWS, AND RULES AND REGULATIONS WILL IMPOSE FINANCIAL OBLIGATIONS UPON THE OWNER OF THE PROPERTY, INCLUDING AN OBLIGATION TO PAY ASSESSMENTS OF THE ASSOCIATION. IF THE OWNER DOES NOT PAY THESE ASSESSMENTS, THE ASSOCIATION OR METRO DISTRICT COULD PLACE A LIEN ON THE PROPERTY AND POSSIBLY SELL IT TO PAY THE DEBT. THE DECLARATION, BYLAWS, AND RULES AND REGULATIONS OF THE COMMUNITY MAY PROHIBIT THE OWNER FROM MAKING CHANGES TO THE PROPERTY WITHOUT AN ARCHITECTURAL REVIEW BY THE ASSOCIATION (OR A COMMITTEE OF THE ASSOCIATION) AND THE APPROVAL OF THE ASSOCIATION. PURCHASERS OF PROPERTY WITHIN THE COMMON INTEREST COMMUNITY SHOULD INVESTIGATE THE FINANCIAL OBLIGATIONS OF MEMBERS OF THE ASSOCIATION. PURCHASERS SHOULD CAREFULLY READ THE DECLARATION FOR THE COMMUNITY AND THE BYLAWS AND RULES AND REGULATIONS OF THE ASSOCIATION.

As is more particularly set forth in Addendum A attached to this Agreement, the Declaration and any association created thereby may have delegated some or all of the duties of the Association to a special taxing district (the "District"). The duties that the Declaration or the Association may delegate to the District include, but are not limited to, architectural review by the Association, as described above, as well as enforcement of the covenants contained in the Declaration.

**5.5 Methamphetamine Laboratory Disclosure.** In accordance with the requirements of C.R.S. § 38-35.7-103, the Seller makes the following disclosure to the Buyer:

THE PARTIES ACKNOWLEDGE THAT SELLER IS REQUIRED TO DISCLOSE WHETHER SELLER KNOWS THAT THE PROPERTY, IF RESIDENTIAL, WAS PREVIOUSLY USED AS A METHAMPHETAMINE LABORATORY. NO DISCLOSURE IS REQUIRED IF THE PROPERTY WAS REMEDIATED IN ACCORDANCE WITH STATE STANDARDS AND OTHER REQUIREMENTS ARE FULFILLED PURSUANT TO C.R.S. § 25-18.5-102, BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS THE RIGHT TO ENGAGE A CERTIFIED HYGIENIST OR INDUSTRIAL HYGIENIST TO TEST WHETHER THE PROPERTY HAS EVER BEEN USED AS A METHAMPHETAMINE LABORATORY. IF BUYER'S TEST RESULTS INDICATE THAT THE PROPERTY HAS BEEN USED AS A METHAMPHETAMINE LABORATORY, BUT HAS NOT BEEN REMEDIATED TO MEET THE STANDARDS ESTABLISHED BY RULES OF THE STATE BOARD OF HEALTH PROMULGATED PURSUANT TO C.R.S. § 25-18.5-102, C.R.S., BUYER SHALL PROMPTLY GIVE WRITTEN NOTICE TO SELLER OF THE RESULTS OF THE TEST, AND BUYER MAY TERMINATE THIS AGREEMENT.

**5.6 Potable Water Sources Disclosures.** In accordance with the requirements of C.R.S. § 38-35.7-104, the Seller makes the following disclosure to the Buyer:

THE SOURCE OF POTABLE WATER FOR THIS REAL ESTATE IS A WATER PROVIDER, WHICH CAN BE REFERENCED IN ADDENDUM A.

SOME WATER PROVIDERS RELY, TO VARYING DEGREES, ON NONRENEWABLE GROUND WATER. YOU MAY WISH TO CONTACT YOUR PROVIDER TO DETERMINE THE LONG-TERM SUFFICIENCY OF THE PROVIDER'S WATER SUPPLIES.

**5.7 Solar Prewire Option - Solar Consultation.**

a. <u>Solar Prewire Option.</u> In accordance with the requirements of C.R.S. § 38-35.7-106, the Parties acknowledge that the Seller has offered the Buyer the opportunity to have the residence's electrical system or plumbing system, or both, include (i) a residential photovoltaic solar generation system or a residential solar thermal system, or both; (ii) upgrades of wiring or plumbing, or both, planned by the Seller to accommodate future installation of such systems; or (iii) a chase or conduit, or both, constructed to allow ease of future installation of the necessary wiring or plumbing for such systems.

b. <u>Solar Consultation.</u> The Buyer acknowledges that the Seller has provided to it a list of businesses in the area that offer residential solar installation services so that the Buyer, if the Buyer so desires, can obtain expert help in assessing whether the Residence is a good candidate for solar installation and how much of a cost savings a residential photovoltaic solar generation system could provide. The Seller has derived this list of businesses from a master list of Colorado solar installers maintained by the Governor's Energy Office.

c. <u>Acknowledgement and Disclaimer by Buyer.</u> The Buyer acknowledges that the master list of solar installers prepared by the governor's energy office does not constitute an endorsement by the Governor's Energy Office or the Seller of any installer or contractor listed. **Pursuant to C.R.S. § 38-35.7-106 (4), the Seller is not liable for**

e. **Technology Limitations of Solar Upgrades.** The Buyer acknowledges that (i) any photovoltaic electrical system upgrades are based on technology available at the time of installation and such upgrades may not support all solar photovoltaic systems or systems installed at a future date, and (ii) the Seller is not liable for or obligated to construct or install any additional upgrades, retrofits, or other alterations to the Residence that may be necessary to accommodate a solar photovoltaic system installed at a future date.

**SECTION 6. RIGHT OF RESCISSION AND REVOCATION.** The Parties agree that, notwithstanding anything to the contrary contained in this Agreement, Buyer shall have the following right to rescind and revoke this Agreement:

**6.1 Consultation with Legal Counsel.** The Parties acknowledge that this Agreement affects the Buyer's rights under the law. Specifically, the Agreement contains a number of releases, waivers, and other complicated provisions that affect the Parties' respective rights and remedies. The Parties agree that it is important that the Buyer understands the legal effect of this Agreement and consultation with legal counsel may be necessary in order for the Buyer to do so. The Seller suggests that the Buyer consult with legal counsel during the Five-Day Revocation Period (as that term is defined in Section 6.3 below).

**6.2 Consultation with Other Professionals.** The Parties acknowledge that the Buyer may consult with professionals regarding all aspects of the Property. The Buyer should review the Future Development and its effect on Open Areas (including the zoning and the uses proposed for the Open Areas). Specifically, the Seller has recommended that the Buyer consult with a licensed soils engineer about the construction of the Residence and soils issues relating to the Residence. The Buyer may also want to consult with persons knowledgeable about drainage, grading, and landscaping. The Buyer may also want to consult with health officials or health professionals regarding any concerns the Buyer has about Mold and the effect that Mold might have on the health of the Buyer or the Buyer's family. The Parties agree that it is important that the Buyer understands all aspects of its purchase of the Residence and consultation with professionals may be necessary. So that the Buyer may fully understand its purchase of the Residence, the Seller suggests that the Buyer consult with such persons and professionals as the Buyer deems appropriate during the Five-Day Revocation Period.

**6.3 Five-Day Right of Revocation.** The Buyer shall have five calendar days (the "Five-Day Revocation Period") from the Date of this Agreement to consider and review this Agreement and consult with such professionals as the Buyer deems appropriate (as described in Sections 6.1 and 6.2 hereof). The Buyer may make such investigations regarding the Property, as the Buyer deems appropriate and may talk to such persons, including government officials, about the Property, as the Buyer deems appropriate. **IF THE BUYER DISCOVERS ANY CIRCUMSTANCES OR FACTS DURING THE FIVE-DAY REVOCATION PERIOD THAT ARE NOT SATISFACTORY TO THE BUYER IN THE BUYER'S SOLE DISCRETION, THEN THE BUYER MAY TERMINATE THIS AGREEMENT ON OR BEFORE THE END OF THE FIVE-DAY REVOCATION PERIOD BY GIVING THE SELLER WRITTEN NOTICE. If the Buyer does not revoke this Agreement by giving written notice during the Five-Day Revocation Period, then the Buyer's right to rescind or revoke this Agreement pursuant to this Section 6 shall automatically terminate without further action by the Seller or notice to the Buyer.**

**6.4 Revocation.** If the Buyer gives written notice, then the Earnest Money Deposit, the Option Inducement Fee, and any other sums paid by the Buyer to the Seller will be returned by the Seller to the Buyer. Upon the giving of written notice pursuant to this Section 6.4, the Buyer will have no further interest in the Property, the Buyer will be requested to sign a release of the Seller, and the Parties will be released from all duties and obligations hereunder.

**SECTION 7. Title Documents.** Before the Closing, the Seller will order a commitment for title insurance (the "Title Commitment") issued by a title insurance company (the "Title Company") showing the status of title to the Property. The Title Commitment will be provided to the Buyer for review as follows:

**7.1 Title Policies.** The Title Commitment will commit to insure (a) title in the Buyer in the amount of the Purchase Price under an ALTA owner's policy of title insurance (the "Owner's Title Policy") and (b) the deed of trust in favor of the Lender in the amount of the Loan under an ALTA lender's policy of title insurance (the "Lender's Title Policy"). The title insurance coverage provided by the Owner's Title Policy will be subject to the Permitted Exceptions (as defined in Section 7.2 below) and the standard exceptions to coverage in title insurance policies issued in the State of Colorado. The Title Company will deliver the Owner's Title Policy to the Buyer after the Closing.

**7.2 Matters of Record; Permitted Exceptions.** The Title Company will be instructed by the Seller to list in the Title Commitment the following matters of record as of the Title Commitment's effective date: (a) all taxes, liens and encumbrances except general taxes for the year in which the Property is conveyed and all subsequent taxes and assessments; (b) all conditions, covenants, declarations, easements, rights-of-way, reservations, restrictions, and other matters of record as of the Closing Date; (c) the matters that an accurate survey or current physical inspection of the Property would reveal; (d) all federal, state, and local laws, ordinances, regulations, and rules; and (e) any taxes or assessments arising by reason of the inclusion of the Property in a municipality or a special improvement district; and (f) a reservation in favor of Seller of all oil, gas, and other mineral rights appurtenant to, associated with, or otherwise relating to the Property. These matters of record, together with any other matters that are added by endorsement to the Title Commitment at or before the Closing, are referred to in this Agreement as the "Permitted Exceptions."

**7.3 Review of Permitted Exceptions.** The Buyer may request copies of the Permitted Exceptions from the Title Company. The Buyer may review the Permitted Exceptions before the Closing and it is recommended that the Buyer consult with the Buyer's legal or other advisor regarding the Permitted Exceptions and the effect that the Permitted Exceptions will have on the Residence, its use, and its value.

**SECTION 8. BUYER EDUCATION.** The Seller has established a program (the "Buyer Education Program") to educate the Buyer about the Residence, its care, and maintenance. The Buyer Education Program consists of four meetings (the "Buyer Education Meetings") between the Buyer and the Seller. The Buyer agrees to participate in the Buyer Education Programs by participating in the Buyer Education Meetings described in this Section 8.

**8.1 Buyer Education Meetings.** The Seller will schedule with the Buyer the following Buyer Education Meetings:

   a. Pre-Construction Meeting. The Pre-Construction Meeting will take place on or about the framing of the Residence. The Pre-Construction Meeting will be at the Property and will be with a representative (a "Community Team Member") of the Seller assigned to the community in which the Property is located. The purpose of the Pre-Construction Meeting will be to demonstrate, explain, and review with the Buyer the various aspects and Selections of the Residence.

   b. Pre-Drywall Meeting. The Pre-Drywall Meeting will take place after the framing of the Residence has been finished, but before drywall is installed. The Pre-Drywall Meeting will be at the Property and will be with a Community Team Member. The purpose of the Pre-Drywall Meeting will be to demonstrate and explain to the Buyer various aspects of the Residence that will be covered up once the drywall and other components of the Residence are constructed.

   c. Demonstration Meeting. The Demonstration Meeting will take place before the Closing. The Demonstration Meeting will be at the Property and will be with a Community Team Member. At the Demonstration Meeting, the Seller will demonstrate the features of the Residence to the Buyer and, if any items need to be addressed in the Residence, the Buyer and the Community Team Member will prepare and execute a list (the "Demonstration List") of items that will be completed by the Seller. The Parties acknowledge that (i) Closing will not be delayed due to any items specified on the Demonstration List and (ii) the Seller will not escrow for any items on the Demonstration List.

   d. Verification Meeting. The Verification Meeting will take place before the Closing. The Verification Meeting will be at the Property and will be with a Community Team Member. At the Verification Meeting, the Buyer and the Community Team Member will verify or note the status of all items on the Demonstration List. Following verification by the Buyer and the Community Team Member that all items on the Demonstration List have been completed or noted, the Buyer and the Seller will acknowledge in writing that (i) the Residence was constructed pursuant to this Agreement and (ii) the Buyer accepts the Residence as being in accordance with the terms of this Agreement.

**8.2 Seller's Right to Terminate for Failure to Participate in Buyer Education Program.** The Buyer's participation in the Buyer Education Program is a condition to the Buyer's purchase of the Residence. If the Buyer does not participate in the Buyer's Education Program or if the Buyer fails or refuses to attend one or more of the Buyer Education Meetings, then, at its option, the Seller may terminate this Agreement. **If the Seller elects to terminate this Agreement pursuant to this Section 8.2, it will notify the Buyer of such fact. Upon the giving of such a notice, the Seller will keep the Earnest Money Deposit, the Option Inducement Fee, and all other monies paid by the Buyer to the Seller and the Buyer will have no further right to the Property.**

**SECTION 9. CLOSING.** The purchase and sale of the Property shall be completed at a closing (the "Closing") in which the Buyer will pay the Purchase Price (as the same may be adjusted pursuant to the terms of this Agreement) to the Seller and the Seller will convey the Property to the Buyer. The Closing will be held as follows:

**9.1 Closing Date, Time, and Place.** The Seller will designate the date (the "Closing Date") of the Closing in the Notice of Completion. The Seller will also designate the time and place of Closing. If the Buyer is not able to close on the designated Closing Date, then, in addition to its other rights under this Agreement, the Seller may extend the Closing Date and the Buyer will pay a fee for extending the Closing Date equal to $250 for each day the Closing Date is extended. This fee will be payable by the Buyer at Closing in certified or other readily available federal funds and will be in addition to the Purchase Price and any other sums due from the Buyer at the Closing.

**9.2 Closing Procedure.** At the Closing and upon performance by the Buyer of its obligations hereunder, the Seller will (a) execute and deliver for recording a good and sufficient general warranty deed to the Buyer conveying the Property free and clear of all exceptions to title other than the Permitted Exceptions; (b) execute and deliver to the Buyer a HOME BUILDER'S LIMITED WARRANTY REGISTRATION FORM and a HOME BUILDER'S LIMITED WARRANTY (as more particularly described in Section 10.1 hereof); (c) assign to the Buyer all warranties that the Seller receives from manufacturers of items located on, installed in, or incorporated into the Residence; and (d) deliver possession of the Residence to the Buyer.

**9.3 Closing and Other Costs.** Closing and other costs will be prorated and apportioned as follows:

   a. Real Estate Taxes and Other Costs. Real estate taxes on the Property for the calendar year in which the Closing occurs shall be prorated as of the Closing Date, based on the most recent levy and assessment and shall be a final settlement. The remaining Closing costs will be adjusted, paid, and prorated as follows: (i) the Buyer will pay all costs associated with the Loan, the cost of the Lender's Title Policy (including any endorsements to such policy requested by the Lender), all prepaid items (including, but not limited to, escrows for insurance and real Property taxes required by the Lender, hazard insurance premiums, prepaid interest, private or FHA mortgage insurance premiums, and the VA funding fee), capital replacement reserves and other sums due in connection with any homeowners' associations and sub associations, and other matters customarily paid by the purchasers of residential real estate in the Denver metropolitan area and (ii) the Seller will pay the cost of the Owner's Title Policy and other matters customarily paid by the sellers of residential real estate in the Denver metropolitan area.

    b. <u>Title Insurance.</u> A current commitment for a title insurance policy in an amount equal to the purchase price shall be furnished by the Seller, at sole cost and expense to Buyer at least ten (10) days before closing (unless the closing is set by this contract in less than ten (10) days from acceptance of this contract). Subsequent to the closing and delivery of the deed, Seller will cause an Owner's Policy of Title Insurance to be issued and delivered to the Buyer and shall pay the premium thereon.

    c. <u>RESPA Disclosure.</u> As required by the Real Estate Settlement Procedures Act of 1974, Buyer acknowledges that the Seller has not directly or indirectly, as a condition of sale, required Buyer to purchase a fee owner's or mortgagee's title insurance policy from any particular company. Seller has advised Buyer that it will purchase, at Sellers sole cost and expense, a fee title policy from a title company selected by the Seller. Seller has also advised Buyer that if the Buyer does not wish to purchase the Mortgagee's Policy from such company, Buyer may elect to obtain such insurance from a company of its own choosing (provided that doing so does not delay the closing) and that Buyer shall pay, at closing, any premium charges and fees charged by that title company for the Mortgagee's Title Policy and related services.

**9.4 Broker.** If a real estate broker or agent is involved in this transaction, then the Seller will pay a referral fee (the "Referral Fee") of 3% of the base/plan price of the Residence (which is $ 423,500.00) to the real estate agent or broker (the "Broker") identified on the signature page to this Agreement. The term "Broker" includes the Broker's agents and employees. The Referral Fee shall be payable from the sales proceeds only upon the Closing of the sale of the Property from the Seller to the Buyer. If the Closing does not occur and the sale is not consummated for any reason, neither the Referral Fee nor any other compensation, fee, or payment shall be due to the Broker. The Referral Fee will be paid at the Closing, and no portion of a Referral Fee payable to a Broker in connection with this Agreement shall be used to lower the Purchase Price of the Property. In exchange for the foregoing agreement from the Seller, the Broker agrees that (a) the Broker shall deal with the Seller only through the New Home Counselor who wrote this Agreement on behalf of Seller and (b) the Broker shall not contact any other employee of Seller other than the New Home Counselor.

**9.5 FHA/VA Requirements.** If the Loan is being financed through the FHA or VA or is otherwise subject to the rules or requirements of the FHA or the VA, then the Parties agree as follows:

    a. <u>Earnest Money Deposit.</u> It is expressly agreed that, notwithstanding any other provisions of this Agreement, the Buyer shall not be obligated to complete the purchase of the Property or to incur any penalty by forfeiture of the Earnest Money Deposit unless the Buyer has been given in accordance with FHA, HUD, or VA requirements, a written statement by the Federal Housing Commissioner, Veterans Administration, or a Direct Endorsement lender setting forth the appraised value of the Property of not less than the Purchase Price. The Buyer shall have the privilege and option of proceeding with consummation of the Agreement without regard to the amount of the appraised valuation.

    b. <u>Appraised Valuation.</u> The appraised valuation is arrived at to determine the maximum mortgage that HUD will insure. HUD warrants neither the value nor the condition of the Property. The Buyer should be satisfied that the price and condition of the Property are acceptable.

    c. <u>VA.</u> If the Buyer is to pay the Purchase Price by obtaining a new VA-guaranteed loan, it is agreed that, notwithstanding any other provisions of this Agreement, Buyer shall not incur any penalty by forfeiture of the Earnest Money Deposit or be obligated to complete the purchase of the Property described herein, if the Purchase Price exceeds the reasonable value of the Property established by the Veterans Administration. The Buyer shall, however, have the right to proceed with this Agreement without regard to the amount of the reasonable value established by the VA.

**SECTION 10. POST-CLOSING MATTERS.** Following the Closing, the Parties agree as follows with respect to the Residence and the Parties' duties regarding the Residence:

**10.1 Construction Defects and Construction Defect Warranty.** If the Buyer discovers a defect in the construction of the Residence after the Closing, the Parties agree as follows:

    a. <u>LIMITED WARRANTY Delivered at Closing.</u> At the Closing, the Seller will (i) execute and deliver to the Buyer a registration form (the "LIMITED WARRANTY REGISTRATION FORM") for the homebuyer's limited warranty program (the "LIMITED WARRANTY") being offered by the Seller at the time of the Closing and (ii) take all other actions necessary for the Buyer and the Residence to qualify for and receive the benefits of the LIMITED WARRANTY. THE LIMITED WARRANTY REGISTRATION FORM and the LIMITED WARRANTY will be in the form and substance of the specimen copy delivered to the Buyer concurrent with the execution of this Agreement, and the Buyer shall execute and deliver to the Seller an acknowledgment acknowledging the Buyer's receipt, review, understanding, and agreement to the terms of the LIMITED WARRANTY.

    b. <u>LIMITED WARRANTY Is the Sole Warranty Given by the Seller.</u> The Buyer acknowledges, understands, and agrees that the LIMITED WARRANTY is the sole and exclusive warranty made or given by the Seller to the Buyer and that the Seller makes no warranty, express or implied, to the Buyer other than as set forth in the LIMITED WARRANTY. The Buyer also acknowledges, understands, and agrees that except for the LIMITED WARRANTY, the Property is being purchased in its "as is" condition. The Buyer further acknowledges, understands, and agrees that consequential or incidental damages (as defined by the LIMITED WARRANTY) are excluded from the LIMITED WARRANTY.

    Disclaimer of Implied Warranties. Except for the LIMITED WARRANTY, ALL EXPRESS WARRANTIES

Buyer's Agreement to Submit and Pursue LIMITED WARRANTY Claims. Buyer agrees that Buyer, in the manner provided in the LIMITED WARRANTY will give Seller notice of any Construction Defect(s) (as defined in the LIMITED WARRANTY) discovered by Buyer after Closing and will pursue Buyer's rights and remedies under the LIMITED WARRANTY.

e. <u>Limitation on Disclaimer of Warranties.</u> Notwithstanding anything to the contrary contained in this Agreement, any limitation on warranty shall not apply to any warranties granted to the Buyer by the Seller under the auspices of the VA.

**10.2 Post-Closing Maintenance by the Buyer.** The Buyer acknowledges that the Guide to Swelling Soils sets forth procedures regarding (a) home maintenance on swelling soils (the "CGS Home Maintenance Guidelines") and (b) landscaping (the "CGS Landscaping Guidelines"). **Following the Closing, the Buyer agrees to comply with the CGS Home Maintenance Guidelines and the CGS Landscaping Guidelines.**

**10.3 Problems Resulting from Water.** The Buyer acknowledges and understands that the presence of water on the Property can result in many serious problems to the Residence. To that end, the Parties acknowledge and agree as follows:

a. <u>Drainage and Grade Issues.</u> The Buyer acknowledges that the Seller has retained an engineer to design the layout of the Property and the pattern in which water will drain from, on, and to the Property. The pattern in which water will drain from, on, and to the Property is referred to in this Agreement as the "Drainage Pattern." At the Closing, the Buyer will receive a certification from that engineer that the Property was graded in accordance with the engineer's drainage plans. **The Buyer acknowledges that changing the grade of the Property or altering the Drainage Pattern or failing to comply with the CGS Home Maintenance Guidelines may result in increased moisture in the Residence. Increased moisture in the Residence can increase the presence of Mold in the Residence and potentially increase the chance of the health problems associated with high levels of Mold in the Property (as described in Section 10.3.c below). Increased moisture can also cause serious structural damage to the Residence and/or to neighboring houses (as described in Section 10.4 below). THE BUYER AGREES AND COVENANTS THAT IT WILL NOT CHANGE THE GRADE OF THE PROPERTY OR THE DRAINAGE PATTERN OF THE PROPERTY AFTER THE CLOSING DATE.**

b. <u>Landscaping Issues.</u> **The Buyer acknowledges that its failure to follow the CGS Landscaping Guidelines may result in increased moisture in the Residence. Increased moisture in the Residence can increase the presence of Mold in the Residence and potentially increase the chance of the health problems associated with high levels of Mold in the Property (as described in Section 10.3.c below). Increased moisture can also cause serious structural damage to the Residence and/or to neighboring houses (as described in the CGS Landscaping Guidelines and Section 10.4 below).**

c. <u>Mold.</u> With respect to fungus, mold, and other microorganisms (collectively, "Mold"), the Parties acknowledge and agree as follows:

   i. <u>Presence of Mold and Health Effects of Mold.</u> Mold occurs naturally in the air, plants, soil, and water. Modern construction techniques that help create a better insulated and warmer home may also have the effect of increasing the presence of Mold in that home. Not all of the adverse health effects of Mold are known, and the Seller is unaware of standards established by health organizations about the levels of Mold that can or should be tolerated in confined spaces like homes. **It is, however, established that Mold can cause allergic reactions or illnesses or aggravate asthma or other lung conditions.** It is impossible, however, to eliminate Mold from structures like the Residence. For example, the crawl spaces and other areas beneath the structural basement floor and other portions of the Residence may support the growth of Mold, particularly if those areas are subject to increased humidity or water.

   ii. <u>Steps to Reduce Moisture and Mold.</u> The Buyer acknowledges that, if the amount of moisture is reduced in the Residence, then the amount of Mold in the Residence may also be reduced. **To reduce the amount of Mold in the Residence, the Buyer will (A) regularly inspect the crawl spaces (if any), under the structural floor (if any), the sump pit and/or sump pump (if any), and the ventilation system as a part of the Buyer's normal maintenance of the Residence, (B) contact and consult with the Seller if the Buyer believes moisture is present in any of these areas of the Residence, (C) take remedial action to reduce moisture buildup if its inspection of such areas reveals the presence of moisture in such areas, (D) ensure that the ventilation system and fan for the space under the structural floor, if any, are operating continuously, and (E) make no alterations to the Property, its drainage, its grading, or the systems installed in the Residence to prevent the build-up of moisture in the Residence.** The Seller may, at the Closing and afterwards, deliver additional suggestions to the Buyer about reducing moisture in the Residence and the amount of Mold in the Residence. If the Seller does so, the Buyer agrees to follow those additional suggestions as well.

**10.4 Problems Associated with Soils.** The Buyer acknowledges that the Seller has advised the Buyer that the soils in the State of Colorado consist of both expansive soils and low-density soils and that the Property is located in the vicinity of such soils. The Buyer represents to the Seller that it understands that soils in the State of Colorado consist of both expansive soils and low-density soils. The Buyer understands that heaving and swelling of expansive soils may result in shifting or other movement of the foundation or concrete flat work (including sidewalks, driveways, garages, patios, and slab-on-grade flooring) or both or may otherwise result in serious damage to the Residence. The Buyer also acknowledges that the water in the soils may increase soil problems and result in serious damage to the Residence. With respect to problems associated with soils, the Parties acknowledge and agree as follows:

suggests that the Buyer, at Buyer's expense, consult with the Buyer's own soils engineer about the Basement/Foundation System recommended by the Seller's soils engineer for the Residence. The Seller suggests that the Buyer make this investigation and satisfy itself regarding the Basement/Foundation System during the Five-Day Revocation Period. The Seller suggests that the Buyer's soils engineer be licensed by the State of Colorado and be a member of C.A.G.E. (Colorado Association of Geotechnical Engineers). With respect to the Basement/Foundation Systems in the Residence, the Buyer and the Seller agree as follows:

i. Post-Tension, Slab-on-Grade Foundation System. The Buyer acknowledges that the Basement/Foundation System of the Residence is a post-tension, slab-on-grade system ("Post-Tension, Slab-on-Grade System"). The Buyer acknowledges that the slab of concrete in this system is reinforced along both its length and its width by special cables that are placed inside the slab of concrete. These cables provide the slab of concrete with its strength. These cables can be adversely affected if the slab is drilled or modified in anyway. Any modification of the slab may harm its structural integrity. ACCORDINGLY, THE BUYER AGREES THAT IT WILL NOT MODIFY THE SLAB OF CONCRETE IN ANYWAY AFTER THE CLOSING.

Buyer's Initials (if Section 10.4.a.i is applicable; if not applicable, Insert "N/A"): N/A / N/A

ii. Slab-on-Grade Basement System. The Buyer acknowledges that the Basement/Foundation System of the Residence is a slab-on-grade system (the "Slab-on-Grade Basement System"). The Slab-on-Grade Basement System has been constructed in the Residence in accordance with the recommendation of the Seller's soils engineer. The Buyer acknowledges that the basement floor in a Slab-on-Grade Basement System is designed to move independently from the foundation wall and interior structural columns. Slab-on-grade construction may heave and crack as a result of settling (from any source) of expansive soils and this type of cracking, heaving, and settling is aggravated by the presence of water in the soil in the area around the Residence. The Buyer agrees to comply with the provisions of Section 10.3 above to reduce the amount of water present in the soil in the area around the Residence. Slab-on-grade construction is commonly used in residential construction in Colorado and is generally considered acceptable for unfinished basements.

Buyer's Initials (if Section 10.4.a.ii is applicable; if not applicable, Insert "N/A"): AM / PM

iii. Structural Basement Floor System. The Buyer acknowledges that the Basement/Foundation System of the Residence is a structural floor system (the "Structural Basement Floor System"). The Buyer acknowledges that Mold can grow if moisture is in the space beneath a Structural Basement Floor System and that the presence of Mold in the Residence may have adverse health effects, including those described in Section 10.3.c.i hereof. The Buyer agrees to take the steps to reduce moisture and the presence of Mold in the Residence as more particularly described in Section 10.3.c.ii hereof.

Buyer's Initials (if Section 10.4.a.iii is applicable; if not applicable, Insert "N/A"): N/A / N/A

iv. Alternative Basement/Foundation Systems. The Buyer acknowledges that the Basement/Foundation System of the Residence utilizes a system for the basement (if any) or foundation that is described in additional provisions.

Buyer's Initials (if Section 10.4.a.iv is applicable; if not applicable, Insert "N/A"): N/A / N/A

b. Disclaimer of Representations and Warranties. **THE SELLER MAKES NO REPRESENTATION OR WARRANTY THAT PATIOS OR GARAGES OF THE RESIDENCE AND, IF NOT FINISHED BY THE SELLER, UNFINISHED BASEMENT OF THE RESIDENCE ARE SUITABLE AS, OR TO BE FINISHED FOR, LIVING SPACE.** The Seller is not selling the Residence on that basis, and the Buyer is not buying the Residence on that basis. If Buyer wishes to finish the basement of the Residence sometime in the future, the Seller recommends that the Buyer do so in accordance with applicable code requirements, the CGS Home Maintenance Guidelines contained in the Guide to Swelling Soils, and the requirements of the LIMITED WARRANTY. The LIMITED WARRANTY does not cover any Construction Defects or other damages resulting, directly or indirectly, from changes, additions, or alterations made to the Residence by anyone after the Warranty Period begins, except those made or authorized by the Seller. If the basement in the Residence is unfinished it and the Buyer does finish the basement in the Residence sometime in the future, the Seller will not be responsible for damages other than as expressly stated in the LIMITED WARRANTY. If the basement in the Residence is finished and the Buyer alters the basement, the Seller will not be responsible for damages other than as expressly stated in the LIMITED WARRANTY.

c. Acceptance by Buyer of Soil Condition. The Buyer, for itself and its assigns, heirs, personal representatives, and successors accepts (i) the soil condition of the Property as set forth in the soils report referenced above, (ii) the foundation design and floor slabs and footing installed incidental thereto as set forth in Section 10.4.a without any expressed or implied warranties other than as are expressly set forth in the LIMITED WARRANTY, and (iii) the presence of Mold in the Property. The Buyer acknowledges that the Five-Day Revocation Period is intended by the Parties to provide a sufficient period for the Buyer to investigate the matters described in this Section 10 and that, if the Buyer does not believe it has had sufficient time to conduct such an investigation, then it should exercise its right to terminate this Agreement.

d. Waiver by Buyer and Disclaimer by Seller. **THE BUYER HEREBY WAIVES, AND THE SELLER HEREBY DISCLAIMS, ALL WARRANTIES OF ANY TYPE OR KIND WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, BY WAY OF DESCRIPTION AND NOT LIMITATION, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, TENANTABILITY, HABITABILITY AND USE, WITH RESPECT TO OR IN CONNECTION WITH THE FACT THAT (1) THE BASEMENT IN THE RESIDENCE, IF ANY, MAY BE CONSTRUCTED AS SLAB-ON-GRADE CONCRETE WHICH MAY HEAVE AND CRACK DURING THE LIFE OF**

CONCRETE FLOOR AND THE PRESENCE OF MOLD IN THE PROPERTY MAY HAVE ADVERSE HEALTH AND OTHER CONSEQUENCES THAT THE PARTIES CANNOT DETERMINE AS OF THE DATE OF THIS AGREEMENT. THE BUYER HEREBY RELEASES SELLER FROM ANY AND ALL DAMAGES OF ANY KIND ARISING OUT OF THE FINISHING OR USE OR BOTH OF THE BASEMENT, GARAGE, OR CRAWL SPACE AS HABITABLE OR LIVING SPACE AND THE PRESENCE OF MOLD IN THE PROPERTY. THE BUYER ALSO UNDERSTANDS THAT THE SELLER'S RESPONSIBILITY TO REPAIR ANY CONCRETE IS LIMITED TO ONE YEAR FROM THE CLOSING DATE.

**10.5 Radon.** The Seller does not test for radon. If the Buyer wants to test for radon, then the Buyer may do so at the Buyer's expense after Closing. If the results of the radon exceed 4 pico Curies per liter, then the Seller shall reimburse to the Buyer up to $900 of the costs incurred by Buyer in the mitigation of such radon based upon qualified invoices to be submitted by the Buyer to the Seller. The testing company must be certified by the Environmental Protection Agency as a party who may conduct radon gas testing. Documentation of such certification must accompany the test results. The test results, request for reimbursement, documentation of certified testing agency, and qualified invoices must be received by the Seller's Customer Service Department within ninety (90) days of the Closing Date. After ninety (90) days from the Closing Date, the Seller will neither (a) accept any documentation relating to testing, request for reimbursement, documentation of certified testing agency, and qualified invoices or (b) be liable for the reimbursement of costs related to testing and/or mitigation thereof.

**10.6 Waiver and Release by the Buyer.** The Seller shall not be liable to the Buyer for damages resulting from (a) changes to the grade of the Property or the Drainage Pattern (as set forth in Section 10.3.a of this Agreement), (b) failure to follow the CGS Landscaping Guidelines and the CGS Home Maintenance Guidelines (as set forth in Sections 10.2 and 10.3.b of this Agreement), or (c) failure of the Buyer to follow the Seller's suggestions to reduce moisture (as set forth in Section 10.3.c of this Agreement). THE BUYER HEREBY RELEASES THE SELLER FROM AND WAIVES ANY CLAIMS, DAMAGES, LIABILITIES, OR LOSSES OF THE BUYER RELATING TO THE RESIDENCE RESULTING FROM (I) CHANGES TO THE DRAINAGE PATTERN OR GRADE OF THE PROPERTY (AS SET FORTH IN SECTION 10.3.a OF THIS AGREEMENT), (II) FAILURE TO FOLLOW THE CGS LANDSCAPING GUIDELINES AND THE CGS HOME MAINTENANCE GUIDELINES (AS SET FORTH IN SECTIONS 10.2 AND 10.3.b OF THIS AGREEMENT), (III) THE FAILURE OF THE BUYER TO CONTACT AND CONSULT WITH THE SELLER IF IT NOTICES THE PRESENCE OF EXCESS MOISTURE OR MOLD IN THE RESIDENCE, (IV) THE FAILURE OF THE BUYER TO FOLLOW THE SELLER'S OTHER SUGGESTIONS TO REDUCE MOISTURE (AS SET FORTH IN SECTION 10.3.c OF THIS AGREEMENT), OR (V) THE BUYER'S ALTERATION OF THE POST-TENSION, SLAB-ON-GRADE FOUNDATION SYSTEM (AS SET FORTH IN SECTION 10.4.a.i OF THIS AGREEMENT). The Buyer indemnifies and holds the Seller, its agents, contractors, managers, and members harmless from any claims, damages, liabilities, or losses resulting from alterations made by the Buyer to the Drainage Pattern or grade of the Property (as set forth in Section 10.3.a), the failure to follow the CGS Landscaping Guidelines and the CGS Maintenance Guidelines (as set forth in Sections 10.2 and 10.3.b), the failure of the Buyer to contact and consult with the Seller if it notices the presence of excess moisture or Mold in the Residence, or the failure of the Buyer to follow the Seller's other suggestions to reduce moisture (as set forth in Section 10.3.c).

**SECTION 11. LIABILITIES OF PARTIES TO EACH OTHER.** The Buyer and the Seller agree as follows with respect to disputes between them:

**11.1 Time Is of the Essence.** Time is of the essence of the obligations of the Parties. Neither Party shall be considered to be in default under this Agreement or as having failed to perform its obligations under this Agreement unless the other Party notifies such Party (the "Defaulting Party") in writing of such default or failure and the Defaulting Party does not cure such default within ten (10) days following the giving of such notice. Notwithstanding the foregoing, no notice of default or non-performance shall be required and no cure period shall be provided for (a) the failure of a Party to perform acts or pay monies required to be paid or performed at the Closing or (b) a Party to give a notice terminating this Agreement pursuant to a provision in Sections 2, 3, 4, 6, 8, 10, or 11 of this Agreement. All disputes regarding default and non-performance relating to this Agreement shall be subject to the limitations set forth in Section 11.3 and resolved by arbitration pursuant to Section 11.4.

**11.2 Default by a Party before Closing.** If either Party does not perform any action required to be performed by it pursuant to this Agreement before Closing or if the Parties are unable to resolve differences between them regarding the terms of this Agreement before Closing, then the Parties will proceed as follows:

  a. Buyer in Default before Closing. If the Buyer has failed to perform its obligations pursuant to this Agreement before the Closing, then, in addition to all other remedies available to it, the Seller may (i) give the Buyer notice (a "Seller's Termination Notice") terminating this Agreement and (ii) retain the Earnest Money Deposit, the Option Inducement Fee, and all other monies paid by the Buyer to the Seller asliquidated damages. Upon the giving of a Seller's Termination Notice pursuant to this Section 11.2.a, the Parties will have no further duties and obligations hereunder and the Buyer will have no further interest in the Property. All disputes regarding the giving of a Seller's Termination Notice and its effect shall be limited by the provisions of Section 11.3 and resolved by arbitration pursuant to Section 11.4.

  b. Seller in Default before Closing. If the Seller has failed to perform its obligations pursuant to this Agreement before the Closing, then, as its sole and exclusive remedy, (i) the Buyer may give the Seller notice (the "Buyer's Termination Notice") terminating this Agreement and (ii) if the Buyer has fully and timely performed all of its obligations hereunder, the Seller will return the Earnest Money Deposit, the Option Inducement Fee, and all other monies paid by the Buyer to the Seller. The Buyer may give a Buyer's Termination Notice only if it has fully and timely performed its obligations hereunder. Upon the giving of a Buyer's Termination Notice pursuant to this Section 11.2.b, the Parties will have no further duties and obligations hereunder and the Buyer will have no further

**11.3 Default by a Party or Disputes between the Parties after Closing.** AFTER THE CLOSING, THE PARTIES AGREE THAT ALL DISPUTES BETWEEN THE [ ] THAT IN ANY WAY RELATE TO THE RESIDENCE (INCLUDING DISPUTES INVOLVING BODILY INJURY AND PERSONAL INJURY) SHALL BE (A) RESOLVED BY ARBITRATION AS PROVIDED IN SECTION 11.4 HEREOF AND (B) SUBJECT TO THE LIMITATION THAT IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR THEIR SUCCESSORS OR ASSIGNS FOR CONSEQUENTIAL DAMAGES, EXEMPLARY DAMAGES, OR PUNITIVE DAMAGES FOR A DEFAULT BY SUCH PARTY IN THE PERFORMANCE OF ITS OBLIGATIONS PURSUANT TO THIS AGREEMENT OR FOR ANY BREACH BY SUCH PARTY OF ANY DUTY OF CARE, WHETHER EXPRESSLY STATED HEREIN OR IMPOSED BY LAW OR OTHERWISE.

**11.4 Arbitration.** Any dispute between the Parties shall be arbitrated as follows:

a. <u>Arbitration Sole Remedy.</u> **The Seller and the Buyer agree that binding arbitration is the sole and exclusive remedy and method for resolving ALL claims, demands, disputes, controversies, or differences between the Buyer and the Seller that in any way relate to or arise out of this Agreement, the construction of the Property, the sale of the Property, or the LIMITED WARRANTY,** including, but not limited to, (i) events, representations, oromissions which predate this Agreement, (ii) the negotiation or execution of this Agreement, (iii) any dispute concerning performance or non-performance of this Agreement by Seller or Buyer, (iv) any dispute concerning drainage, mold, radon, or soils, (v) any dispute concerning any waiver or disclaimer of any warranty, (vi) any dispute subject to binding arbitration under the LIMITED WARRANTY, or (vii) any bodily injury, personal injury, or Property damage or loss relating to any alleged defect in construction of the Residence.

b. <u>Disputes Subject to Arbitration under LIMITED WARRANTY.</u> Any dispute between the Seller and the Buyer that is subject to binding arbitration under the LIMITED WARRANTY shall be decided by binding arbitration as provided in the binding arbitration procedure set forth in the LIMITED WARRANTY. The demand for arbitration under the LIMITED WARRANTY shall be made in the manner and within the time provided in the LIMITED WARRANTY.

c. <u>Disputes Not Subject to Arbitration under LIMITED WARRANTY.</u> With respect to any dispute between the Buyer and the Seller which, for any reason (including, without limitation, any determination that a specific dispute or issue is not subject to arbitration under the LIMITED WARRANTY or any determination that any term or provision of the LIMITED WARRANTY is unenforceable), is not subject to arbitration under the LIMITED WARRANTY, such dispute shall be decided by binding arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association Industry Arbitration Rules and the Procedures for Large, Complex Construction Disputes of the American Arbitration Association then in effect. The demand for arbitration of any such dispute shall be filed in writing with the other party and with the American Arbitration Association. In no event shall such demand be filed after the date when institution of legal or equitable proceedings based on such demand would be barred by the applicable statute of limitations.

d. <u>Manner of Arbitration.</u> The Seller and the Buyer agree that the arbitration provisions set forth in this Agreement and in the LIMITED WARRANTY shall be governed by the United States Arbitration Act (9 U.S.C. §§ 1-16).

e. <u>Manner of Enforcement of Arbitration Provisions.</u> The Seller and the Buyer agree that the arbitration provisions set forth in this Agreement and in the LIMITED WARRANTY shall be specifically enforceable and that any party who commences litigation in violation of the arbitration provisions of this Agreement or the LIMITED WARRANTY shall reimburse the other party for all of the other Party's costs and expenses, including reasonable attorney's fees incurred in enforcing these arbitration provisions, including, but not limited to, seeking dismissal of such of litigation.

f. <u>Expense of Arbitration.</u> The Seller and the Buyer agree that each party shall pay its own expenses in connection with any arbitration, including the remittance of any required arbitration filing fee, which will be paid by the party initiating the arbitration. If the Buyer initiates the arbitration and the arbitrator(s) find in the Buyer's favor, the amount the Buyer advances for the arbitration filing fee will be reimbursed by the Seller to the Buyer.

g. <u>Nature of Arbitration Award.</u> The Seller and the Buyer hereby agree that the award rendered by the arbitrator(s) shall be final and binding, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**11.5 Buyer's Legal Rights.** The provisions of this contract are not intended and shall not be interpreted or applied as an express waiver of, or limitation on, the Buyer's legal rights, remedies, or damages provided by the "Construction Defect Action Reform Act," Part 8 of Article 20, Title 13, or provided by the "Colorado Consumer Protection Act," Article 1, Title 6, as described in Section 806 of Article 20, Title 13, Colorado Revised Statutes, or on the Buyer's ability to enforce such legal rights, remedies, or damages within the time provided by applicable statutes of limitation or repose. Damages that may be claimed or recovered by Buyer in connection with Agreement, the Property and/or the Residence shall be limited as set forth in the foregoing statutes.

**SECTION 12. GENERAL PROVISIONS.** The Parties agree that the following provisions apply to this Agreement:

**12.1 Amendment.** This Agreement may only be amended by a change order, document, instrument, or other written instrument that has been executed and delivered by both the Buyer and the Seller.

**12.2 Approvals.** Upon approval hereof by an authorized officer of the Seller, this Agreement shall become a contract between the Buyer and the Seller.

**12.3 Compliance with Patriot Act.** The Buyer hereby warrants and represents to the Seller that the Buyer (a) is not listed on the Specially Designated Nationals List of the United States Treasury Department Office of Foreign Assets Control, (b) is not

**12.4 Construction.** The Recitals to this Agreement will, to the extent appropriate, be interpreted as covenants of the Parties. Captions to paragraphs are for convenience and reference purposes only and will not affect the construction of the meaning of the terms and provisions of this Agreement. Whenever the context requires or permits, the singular will include the plural, the plural will include the singular, and the masculine, feminine, and neuter will be freely interchangeable.

**12.5 Counterparts; Facsimile.** This Agreement may be executed in one or more counterparts, each of which will constitute an original agreement, but all of which together will constitute a single agreement. A facsimile transmitted copy of this Agreement executed by one of the Parties hereto will be accepted as a copy of this Agreement originally executed by such Party.

**12.6 Entire Agreement.** The Parties intend and agree that this Agreement set forth their entire understanding and agreement. The Parties further intend and agree that all prior agreements, conversations, discussions, representations, and statements be merged and incorporated into this Agreement and that none of such prior agreements, conversations, discussions, representations, and statements survive the execution and delivery of this Agreement. The Parties further intend and agree that (a) this Agreement sets forth the entirety of their respective rights, duties, obligations, and responsibilities relative to each other, the Property, and the Residence and (b) neither Party owes the other Party any contract, statutory, or other duty that is not expressly set forth in this Agreement. The Parties have not made any agreements or promises with each other that are not set forth in writing in this Agreement. The Parties have not made any representations or warranties to each other except as expressly set forth in writing in this Agreement.

**12.7 Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of Colorado.

**12.8 Notices.** Whenever this Agreement requires an approval, consent, or notice, such approval, consent, or notice shall be in writing and shall be deemed given the date mailed to the address set forth on this Agreement.

**12.9 Power of Attorney.** By the signing of this Agreement, Buyer grants and permits the Seller, its successors or assigns or both, the right to alter or amend the planned building group, planned unit development, or subdivision plats of the community in which the Property is located. The Seller shall retain this right until all the lots in the community have been sold and conveyed to third-party purchasers. At the request of the Seller, the Buyer will execute and deliver a power of attorney confirming this grant at the Closing.

**12.10 Prohibition against Recording.** This Agreement may not be recorded. If this Agreement is recorded by either Party before the Closing, then, at its option, the Party that did not record this Agreement may treat such recording as a default by the recording Party and may proceed in the manner set forth in Section 11 hereof.

**12.11 Seller; Sales Representatives.** The Seller hereby discloses that its representatives are employees and agents of the Seller. No agent, employee, or representative of the Seller has any authority to modify the terms of this Agreement or the authority to make any oral representation or agreement upon which Buyer may rely to cancel, change, or modify any portion of this Agreement. This Agreement supersedes all prior understandings and agreements.

**12.12 Seller's Right to Repurchase Home after Closing.** If a disagreement or dispute arises after transfer of title to the Buyer, the Seller may, at its option and as an end to further liability, offer to repurchase (the "Repurchase Offer") the Property from the Buyer, as follows: The Seller may offer to repurchase the Property by paying to the Buyer the greater of (a) the fair market value of the Property (as determined in the manner hereinafter provided and in no event greater than the value as affected by any restrictions on appreciation placed against or affecting title to the Property) or (b) the Purchase Price of the Property plus (i) all costs paid by the Buyer in connection with the Loan, but not to exceed 1.5% of the amount of the Loan and (ii) $1,000 to cover Buyer's expense of moving or relocating. If the Seller makes a Repurchase Offer and the Buyer either rejects such offer or does not accept it within ten (10) days after a certified letter is mailed to the Buyer at the address of the Property, the Seller shall have no further obligation whatsoever to the Buyer. If the Buyer accepts the Seller's offer to repurchase, the Buyer shall so inform the Seller in writing, and within thirty (30) days from the date of acceptance of the Seller's offer, deliver the Property back to the Seller in the same condition as it was in at the time the Seller conveyed title to the Buyer, ordinary wear and tear excepted. The title shall be free and clear of all matters except for taxes for the year in which the deed from the Buyer to the Seller is to be recorded, the Permitted Exceptions, and the deed of trust securing repayment of the Loan, which the Seller shall assume and agree to pay. In the Repurchase Offer, the Seller shall advise the Buyer of the fair market value of the Property as determined by a valuation prepared by an independent third-party appraiser selected by the Seller; provided, however, that any appraisal must take into account and give effect to any restrictions on appreciation in value that affect title to the Property. The Seller shall pay the cost of the appraisal described in this Section 12.12, and any disputes regarding the Repurchase Offer shall be arbitrated in the manner set forth in Section 11.4 hereof.

**12.13 Seller's Unilateral Right to Terminate This Agreement.** Notwithstanding anything to the contrary contained in this Agreement, the Seller reserves the unilateral right to terminate this Agreement by notice at any time after the Date of this Agreement and before the Closing Date. If the Seller elects to terminate this Agreement pursuant to this Section 12.13, it will notify the Buyer of such fact. Upon the giving of such a notice, the Seller will return to the Buyer the Earnest Money Deposit, the Option Inducement Fee, and all other monies paid by the Buyer to the Seller (less an administration fee of $100 and the cost [minimum of $300] of the CMCR, if applicable), and the Buyer will have no further right to the Property.

**12.14 Severability of Terms of Agreement.** All terms and conditions of this Agreement will be deemed severable. Should

**12.15 Successors and Assigns.** Buyer may not assign this Agreement or rights hereunder without the Seller's prior written consent. Provided the Buyer has first obtained the Seller's written consent to an assignment, this Agreement will be binding upon and inure to the benefit of the Parties hereto, their representatives, successors, and assigns. Any third party asserting claims against the Seller in connection with the Residence or rights to the Residence or the Property pursuant to this Agreement will, by acceptance of a deed to the Property, be deemed to have agreed to (a) be subject to the limitations set forth in Section 11.3 hereof and (b) resolve such claims or disputes regarding such rights pursuant to arbitration as set forth in Section 11.4 hereof. The deed from the Seller to the Buyer at the Closing will contain a provision similar to this provision.

**12.16 Survival of Provisions.** All covenants and terms of this Agreement requiring performance or that are applicable after the Closing Date will survive the Closing of the transactions contemplated by this Agreement and will not merge with the deed delivered by the Seller at the Closing. Specifically, the Parties agree that the arbitration provisions set forth in Section 11.4 hereof will survive the Closing and be applicable to disputes between the Parties after the Closing.

**12.17 Working Day; Calendar Day.** Whenever a reference is made in this Agreement to "day" or "days," the reference is to the actual number of calendar days specified unless the reference is to "working day" or "working days." For the purposes of this Agreement, the term "working day" means a day upon which the Seller is able to perform work on the Residence. If the date for the performance of any term or obligation of this Agreement is scheduled to occur on a date upon which national banks are not open for business, then such date will be extended to the next day upon which national banks are open for business and such a day will be referred to in this Agreement as a "working day."

**12.18**

N/A - means not applicable

TBD - means to be determined

**SECTION 13. ADDITIONAL PROVISIONS.** The following additional provisions are made a part of this Agreement: Seller agrees to contribute up to $4,000.00 towards structural options when using our "Preferred Partners". Contract purchase price reflects price adjustment of $4,000.00.

Buyer(s) are receiving the Oakwood Homes "Guaranteed Energy Bills" for 24 months from date of closing

Realtor to be paid 3% of the purchase price $463,935.00 in lieu of section 9.4 of this agreement

Buyer understands they are purchasing a designer showcase home and no changes can be made.

Buyer selected exteriior color Richmond Red and stone color Black Rundle

BUYER'S ACKNOWLEDGMENT. The undersigned hereby acknowledge that they have read the terms contained on these pages hereof (exclusive of the Addendum) and acknowledge that such terms are a material and integral part hereof. Buyer(s) certifies (certify) that he/she (they) has (have) read this Agreement. Buyer acknowledges that this Agreement will not be binding on Seller until Seller and its sales counselor have signed it.

_____  7-7-16  _____  7-7-16
Derrick J. Martin Jr.            Date         Alexa S Martin                       Date

_____  7-7-16
Sales Counselor                   Date
Oakwood Homes, LLC

I/We, <u>Derrick J Martin Jr.</u> and <u>Alexa S Martin</u>, would like to refer the following family or friends to Oakwood Homes, LLC.

Name: _____   Name: _____

Address: _____   Address: _____

_____   _____

Phone: _____   Phone: _____

Email: _____   Email: _____


Name: _____   Name: _____

Address: _____   Address: _____

_____   _____

Phone: _____   Phone: _____

Email: _____   Email: _____

THIS AGREEMENT shall not be binding until an authorized officer of the Seller signs it on behalf of the Seller.

SELLER:
OAKWOOD HOMES, LLC,
a Colorado limited liability company

Date: 7/18/2016

By: *Vanise Fuqua*

Its: *Regional Sales Manager*

THIS AGREEMENT is executed by the undersigned as the Broker identified in this Agreement. By its execution of this Agreement, the Broker agrees to be bound by the provisions of the Agreement.

Date: 7-7-16

_____
BROKER